Victor Mecca, et al. [1] v. Commissioner. Mecca v. Commissioner
Docket Nos. 6169-64 - 6171-64.
United States Tax Court
T.C. Memo 1968-258; 1968 Tax Ct. Memo LEXIS 42; 27 T.C.M. (CCH) 1365; T.C.M. (RIA) 68258; November 12, 1968, Filed. *42 Samuel J. Davidson, 921 Bergen Ave., Jersey City, N. J., for the petitioners. William M. Gross, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in income tax and additions to tax against the above-named petitioners as follows: 1366 Docket
Petitioner
Year
Deficiency
Addition to tax
No.
Sec.6653(b) I.R.C.
1954
6169-64
Victor Mecca
1958
$4,287.50
$2,143.75
6170-64
Victor Mecca and
1959
4,199.37
2,099.69
Gladys Mecca
[2] 1960
6,336.73
3,168.37
6171-64
Victor Mecca and
1956
3,759.82
1,879.91
Helen Mecca
1957
4,228.86
2,114.43
The issues for decision are: (1) Whether for each of the taxable years involved, the husband-petitioner received taxable income which was not reported on the joint income tax returns filed by him and his wife (or by him alone for 1958), and, if so, the amounts of said unreported income; [3]
*43 (2) Whether a part of any deficiency for any of the years involved is due to fraud with intent to evade tax; (3) Whether assessment and collection of any deficiencies and additions to tax for the years 1956 and 1957 are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits therein identified are incorporated herein by reference. Victor Mecca (hereinafter referred to as Victor) and Helen Mecca (deceased) were married in 1941. Helen Mecca died on February 7, 1959. She was quite ill and spent a good bit of time in the hospital during the last 2 years of her life. Victor Mecca and Gladys Wolfe Mecca (hereinafter referred to as Gladys) were married on February 21, 1959. Federal-income tax returns were filed with the district director of internal revenue at Newark, New Jersey, as follows: Year
Petitioner
1956
Victor and Helen Mecca (joint)
1957
Victor and Helen Mecca (joint)
1958
Victor Mecca (individual)
1959
Victor and Gladys Mecca (joint)
1960
Victor and Gladys Mecca (joint)
The legal residence of Victor and Gladys at the time the petition was filed was Union City, *44 N.J. Victor has been in the glass business during his entire working career. He began a sole proprietorship in Union City in 1949. In 1952 he entered into a partnership with Harold Strickland, who was then operating a competing business, the Doris Glass Co. The partnership operated under the name of A & A Glass Co. until December 31, 1954. Effective January 1, 1955, Victor purchased Strickland's partnership interest for $15,000, evidenced by unsecured promissory notes payable over a 5-year period at $250 per month. Thereafter the business was operated by Victor as a proprietorship known as the A & A Glass Co. (hereinafter referred to as Glass). By early 1958 Victor had paid the promissory notes given to Strickland in full. The principal business of Glass was the installation of automobile windows to such recurring customers as automobile repair shops and insurance companies. These sales were made on a credit basis and designated as "charge sales." The designation "cash sales" was used with respect to all noncharge sales, whether payment was made in cash or by check. Victor kept careful records with respect to charge sales. The original document consisted of a prenumbered sales *45 invoice which sometimes referred to the customer's purchase order. The customer signed the sales invoice after completion of the work. The invoice was entered into a sales journal containing the customer's name and amount of sale. Monthly totals from the sales journal were posted to the general ledger accounts which were kept for sales and accounts receivable. There was also a subsidiary ledger of accounts receivable for individual entries in the sales journal. This contained a separate account sheet for each charge customer which was used for billing purposes. Payments on these accounts were deposited in the bank and credited to the appropriate accounts on Victor's books and records. These books and records and the 1367 supporting invoices were available at the time respondent began auditing petitioners' returns. According to Victor, as we understand his testimony and the facts stipulated, the following procedure was used in connection with "cash sales." When a cash sale was made, whether paid for with currency or by check, the amount of the sale was first entered on old Doris Glass Co. invoices in a manner which reflected a running account of the cash sales. When the sales *46 entered on an invoice reached the bottom of the invoice the amounts entered thereon were totaled and the total amount was carried forward to the top of the next unnumbered invoice and the procedure was continued. Weekly or periodically the "cash" receipts were supposedly deposited in the bank and simultaneously recorded on Victor's books as cash receipts. Once a month the total of the cash receipts entries was posted to the sales journal. The used original entry invoices were not retained and there were no documents available at the time of respondent's audit to support or check the cash sales entries on Victor's books. Actually Victor deposited only a small amount of currency in his business bank account that was credited to cash sales. A comparison of the deposit slips retained by the bank with Victor's books and records revealed that practically all sales recorded as such were paid by check. Victor testified that the currency received from cash sales was kept first in a cash drawer and later placed in a safe or vault; and that he withdrew approximately $100 per week from this source for living expenses, placing an IOU in the cash drawer or safe where the currency was kept to reflect *47 the amount withdrawn. At the end of each year the IOU's were totaled and the total amount was credited as a lump sum on the books as cash sales. The books did reflect a lump-sum credit to sales at the end of each year here involved, except the year 1960; but the IOU's were not retained. The amounts so credited to sales were as follows: Year
Amount
1956
$6,000
1957
6,240
1958
6,200
1959
5,200
1960
None Victor testified that periodically any excess currency that he did not need for living expenses was deposited in the business bank account and credited to cash sales. The total sales recorded on Victor's books for each of the years here involved were reported on petitioners' income tax returns for the respective years as gross receipts of the business. The gross receipts reported and the net profit from the business reported on the returns were as follows: Year
Gross
Net profit
receipts reported
reported
1956
$44,774.64
$2,812.31
1957
49,216.43
4,348.73
1958
42,511.57
991.95
1959
49,031.40
3,488.11
1960
50,878.04
4,938.64
Rather large deposits of cash were made in Victor's business account from time to time but in *48 most instances these cash deposits were credited to Victor's capital account in the business, rather than to sales. The amounts of cash deposits so credited to capital in each of the years here involved were as follows: Year
Amount
1956
$22,884.29
1957
52,667.50
1958
13,576.67
1959
17,683.81
1960
3,437.78 A comparison of the relatively large credits to Victor's capital account as compared to the net profit reported from the business first aroused the curiosity of respondent's agent sent in to audit Victor's returns. Upon receiving no explanation of a nontaxable source of these funds that he considered reasonable, and finding no support therefor from Victor's books and records, respondent's agents made an analysis of Victor's bank deposits in an effort to determine Victor's gross receipts. After eliminating all amounts of nontaxable receipts from sources which were either suggested to them by Victor and Gladys or which they could find, such as loans, redeposits, inheritances, insurance, etc., they determined that petitioners had unexplained gross receipts deposited in the business bank account in excess of the amounts of gross receipts reflected on their returns *49 in the following amounts: Year
Amount
1956
$9,600.00
1957
7,700.00
1958
7,800.00
1959
9,646.81
1960
3,437.78
Respondent added to the above amounts unexplained deposits in petitioners' personal checking and savings accounts, certain specific items of cash expenditures (principally cash loans made by Victor and repayment 1368 of loans made by Victor in cash), and estimated cash living expenses (which were the amounts entered into sales as a lump sum at the end of each year which Victor testified he withdrew from cash receipts for living expenses for each of the years 1956-1959, and an average of those amounts for the year 1960), made certain minor adjustments to accounts receivable, etc., and determined that petitioners had unreported gross receipts and additional taxable income upon which the deficiencies are based, in the following amounts: Year
Amount
1956
$14,735.00
1957
13,735.00
1958
17,363.41
1959
14,695.65
1960
15,324.29
Respondent's computation of petitioners' additional income per statutory notice of deficiency is as follows: COMPUTATION OF
UNREPORTED GROSS
RECEIPTS BANK DEPOSITS
PLUS CASH EXPENDITURES
METHOD
1956
1957
1958
1959
1960
BANK DEPOSITS
Business A/C-Weehawken
$62,320.97
$94,233.99
$50,704.28
$61,850.65
54,507.86
Trust Co.
Personal A/C-Weehawken
2,510.00
26,209.13
5,792.84
17,361.85
8,559.69
Trust Co.
A/C #234814-East River
1,093.36
Savings Bank
A/C #460681-East River
5,000.00
Savings Bank
A/C #53497-East River
10,000.00
Savings Bank
CASH EXPENDITURES
Specific items
3,050.00
3,200.00
5,350.00
Cost of living
6,000.00
6,240.00
6,200.00
5,200.00
5,910.00
TOTAL BANK DEPOSITS &
73,880.97
129,883.12
68,047.12
85,505.86
83,977.55
CASH EXPENDITURES
@CREDITS FOR
NON-INCOME DEPOSITS
Business A/C-Weehawken
13,371.79
45,227.47
5,948.68
8,042.00
915.33
Trust Co.
Personal A/C-Weehawken
23,009.13
1,758.86
7,412.04
3,281.69
Trust Co.
A/C #234814-East River
1,093.36
Savings Bank
A/C #460681-East River
2,700.00
Savings Bank
A/C #53497-East River
5,150.00
Savings Bank
Rental income reported
420.00
350.00
900.00
by petitioners
Gladys Mecca's salary
5,235.97
5,551.49
re- ported by
petitioners
TOTAL CREDITS FOR
13,791.79
68,586.60
7,707.54
21,783.37
18,498.51
NON-INCOME DEPOSITS
NET BANK DEPOSITS AND
60,089.18
61,296.52
60,339.58
63,722.49
65,479.04
CASH EXPENDITURES
TECHNICAL ADJUSTMENTS
Accounts receivable
( 574.54)
1,670.91
( 544.08)
( 235.44)
739.29
adjustment
Net other adjustments
( 35.00)
( 16.00)
79.47
240.00
( 16.00)
CORRECTED GROSS
59,479.64
62,951.43
59,874.98
63,727.05
66,202.33
RECEIPTS
LESS: GROSS RECEIPTS
44,744.64
49,216.43
42,511.57
49,031.40
50,878.04
REPORTED
ADDITIONAL INCOME PER
14,735.00
13,735.00
17,363.41
14,695.65
15,324.29
STATUTORY NOTICE OF
DEFICIENCY
*50 Specific items of gross income derived from Victor's business activities were deposited in Victor's personal checking account and were not included in income reported by petitioners on their returns. The totals of these items were as follows: Year
Amount
1956
$ 89.00
1957
578.00
1958
40.40
1959
1,237.74
1960
1,495.78 Petitioners also claimed business expense deductions on their returns for depreciation and other expenses of maintaining their personal residence for each of the years involved and also claimed deductions as business expense in 1959 and 1960 of expenditures made in behalf of others for which they were reimbursed, the reimbursements not being reported as income. Victor kept the books and records of the business, occasionally receiving instructions and suggestions with respect thereto from a cousin who was an accountant. Victor also prepared petitioners' returns for the years here involved. Income and expenses reported on petitioners' returns were in agreement with their books and records. Helen Mecca was ill for about 2 years before she died and was not active in the business or bookkeeping functions at any time. Gladys assisted Victor in *51 the bookkeeping functions to some extent after they were married. Victor's explanations of the sources of his unexplained deposits and cash expenditures varied from time to time. The principal sources suggested by Victor were his mother, Rena, whose principal source of funds was said to be her mother and Victor's grandmother, Marie Sanders; Victor's father; Gladys; and his cash withdrawals from the business. Petitioners offered no proof with respect to the latter source and in the light of Victor's explanation of the manner in which he made the withdrawals and the purpose for which they were used, we cannot find that any of the withdrawals, except those few possibly allowed by respondent, were deposited in the bank accounts or used for the rather sizable cash expenditures charged to Victor. Marie Sanders, Victor's grandmother, did not work after the death of her husband in 1914. At that time she owned various parcels of income-producing real estate which she gradually disposed of over the years. The last of these properties was sold in 1938 and her personal residence was sold in 1945. For the last 15 years of her life Marie lived with her unmarried son, Joseph Sanders, who paid *52 the rent and gave Marie $35 per week with which to run the house. At the time of her death Marie's residuary estate was worth about $8,600. Marie died in 1954. Vincent Mecca, Victor's father, who testified at the trial, was employed as a paper box worker at a gross salary of no more than $100 per week. Vincent gave most of his pay check to Rena, before her death, to pay for their living expenses. Vincent had no savings account of his own, knew of no cash accumulation of his wife, Rena, and was not in a position to and did not give any substantial amount of money to Victor. Rena Mecca, Vincent's mother, was not employed during her married life; she spent much of her time caring for her mother. Rena had no checking account, no hoard of cash, and no savings account until her mother died in 1954. Rena inherited $2,156 in cash from her mother, which she put into a savings account and kept it there until her death. Rena died in August of 1957 and her estate consisted of the above cash plus a $10,000 life insurance policy, one-fourth of the proceeds from which apparently went to Victor. Rena was not in a financial position to, and did not, provide Victor with any substantial sums of money *53 during the years here involved. Gladys Wolfe Mecca was unmarried until she married Victor at the age of 36 or 37, in February of 1959. She was employed as a secretary and statistician by Hanover Insurance Company in New York City from 1940 until she terminated her employment in September of 1961. Prior to her marriage to Victor she lived at home with her parents in Jersey City, N.J. She had few expenses and lived frugally. Her salary when she started to work for Hanover in 1940 was $65 per month. Her salary was increased steadily over the years until she was receiving $130 per week in 1960. In addition to her salary, Gladys received bonuses, overtime pay, and a living expense allowance from time to time. Gladys accumulated a part of her income in cash, which she kept in a metal box at home. She also opened two savings accounts in the East River Savings Bank in New York, one in her own name in 1949, and one in the joint name of herself and her mother in 1953. The balance in her 1370 own account on March 2, 1959, was $4,305.24, which she withdrew on that date. The balance in the other account was $67.34 when it was withdrawn on the same date. Two savings accounts were opened in *54 the same bank in the names of Victor and Gladys Mecca after they were married in 1959. Gladys also had a checking account in a New York bank. An analysis made by respondent's agents, from the Hanover records still available at the time, of funds available to Gladys from her salary and other sources from 1940 until February of 1959, and the balance of such funds available for accumulation of a cash hoard after deducting deposits to bank accounts and estimated living expenses, is as follows: GLADYS MECCA -
COMPUTATION OF
FUNDS AVAILABLE
FOR CASH HOARD AS
OF FEB. 19, 1959
Net
Other
Total
Net deposits
salary
funds
funds
to checking
Year
available
available
available
and savings
1940
$ 248.55
$ 248.55
1941
851.55
851.55
1942
1,070.48
1,070.48
1943
1,291.95
1,291.95
1944
1,403.96
1,403.96
1945
1,575.89
1,5 75.89
1946
1,988.09
1,988.09
1947
2,280.53
2,280.53
1948
2,565.06
2,565.06
1949
2,767.19
2,767.19
$ 100.00
1950
2,967.47
2,967.47
105.00
1951
3,349.11
3 ,349.11
0
1952
3,551.20
3,251.50
100.00
1953
3,778.00
$ 200.00
3,978.00
2,189.38
1954
4,006.40
1,250.00
5,256.40
1,673.00
1955
4,253.56
640.00
4,893.56
3,472.84
1956
4,525.14
50.00
4,575.14
3,943.69
1957
4,992.81
290.99
5,283.80
2,773.30
1958
4,998.74
1,209.91
6,205.65
6,464.53
1959
738.30
1,042.70
1,781.00
2,837.59
53,203.98
4,680.60
57,884.58
23,659.33
*55 Net funds available
Estimated cash living
Balance available
before cash
expenses
for cash hoard
Year
living expenses
1940
$ 248.55
$ 248.55
0
1941
851.55
851.55
0
1942
1,070.48
1,070.48
0
1943
1,291.95
1,200.00
$ 91.95
1944
1,403.96
1,200.00
203.96
1945
1,575.89
1,200.00
375.89
1946
1,988.09
1,500.00
488.09
1947
2,280.53
1,500.00
780.53
1948
2,565.06
1,500.00
1,065.06
1949
2,667.19
1,500.00
1,167.19
1950
2,862.47
1,500.00
1,362.47
1951
3,349.11
1,500.00
1,849.11
1952
3,451.20
1,500.00
1,951.20
1953
1,788.62
1,500.00
288.62
1954
3,583.40
1,500.00
2,083.40
1955
1,420.72
1,500.00
( 79.28)
1956
631.45
1,500.00
( 868.55)
1957
2,510.50
1,500.00
1,010.50
1958
( 258.88)
1,500.00
(1,758.88)
1959
(1,056.59)
180.00
(1,236.59)
34,225.25
2,545.58
8,774.67 1371 The column in the above table reflecting net salary available represents respondent's computation of Gladys' gross salary, including bonuses, estimated overtime, and allowances, less Social Security, Federal and State income taxes withheld, and health insurance premiums withheld. By letter dated October 31, 1960, Gladys *56 advised respondent's agents that at the time she invested money in her husband's business she withdrew the balances in her savings and checking accounts in New York totaling $5,000 in March of 1959 and added $10,000 taken from her cash savings at home for a total investment of $15,000. In the course of a recorded interview with the revenue agents on February 5, 1962, Gladys stated that she first started advancing money to Victor in late 1958 or early 1959, that she had a cash hoard of about $70,000 at home prior to that time, of which she advanced about $30,000 to Victor and his business, and that she then had approximately $40,000 in cash left, the location of which she would not disclose. In her testimony at the trial Gladys testified that she had a cash hoard of about $35,000 which she first started advancing to Victor in late 1957 and that she continued to advance funds to him from time to time until the fund was exhausted in 1960. Ultimate Findings of Fact Gladys had an accumulation of cash at home totaling something in excess of $10,000, $3,500 of which she advanced to Victor in 1958, $4,500 of which she advanced to Victor in 1959, and $2,000 of which she advanced to Victor *57 in 1960. Any excess cash Gladys may have had was not deposited in the bank or used for cash expenditures by Victor or Gladys during the years here involved. Victor's books and records were inadequate to, and did not, reflect all of the income of the business. Petitioners failed to include in taxable income reported on their returns for each of the years 1956, 1957, 1958, 1959, and 1960 the amounts determined by respondent in his notice of deficiency, adjusted downward for the years 1958, 1959, and 1960 to reflect the nontaxable advances found above to have been made by Gladys to Victor in each of those years. For each of the years 1956 through 1960 all or a part of the deficiency in tax owing by petitioners was due to fraud with intent to evade tax. Petitioners filed false and fraudulent returns with intent to evade tax for each of the years 1956 and 1957. The assessment and collection of the deficiencies and additions to tax owing by petitioners for the years 1956 and 1957 is not barred by the statute of limitations. Opinion The first issue is whether petitioners had taxable income in the years before us which they failed to report on their income tax returns for those *58 years. Respondent determined that they did have unreported taxable income in each of the years before us in the amounts set forth in our findings of fact by use of the bank deposits plus cash expenditures method. Under this method respondent took the total amounts deposited in petitioners' bank accounts each year, deducted therefrom all amounts which he could determine represented nontaxable income, and added thereto the stipulated (except for 1960, which was an average) amounts of cash petitioners used for living expenses, to arrive at petitioners' corrected gross receipts. From this he subtracted the gross receipts from Victor's business reported on petitioners' returns, and determined that the balance was unreported gross and taxable income. Victor admittedly withdrew cash from the business receipts in each of the years except 1960, he deposited very little currency in his business bank account that was credited to sales, and he was not able to show respondent any written record of the amounts of cash he had withdrawn from the business throughout the years. Consequently, it was necessary for respondent to use some other means of checking the accuracy of the income reported by *59 petitioners. He used the bank deposits and cash expenditures method to check the accuracy of Victor's books and records and to determine petitioners' income when he discovered that Victor's books were inaccurate and inadequate for that purpose. This is an accepted method to use for this purpose, ; ; in fact, that method seems particularly appropriate under the circumstances of this case. Respondent appears to have made a reasonable effort to verify and eliminate all nontaxable income, and it cannot be said that his determination was arbitrary or unreasonable. Under these circumstances petitioners clearly have the 1372 burden of proving that respondent's determinations were in error. The principal thrust of petitioners' efforts to carry their burden of proof was the testimony of Victor and Gladys that the large unexplained deposits of cash in the business bank account which were credited to Victor's capital account came from nontaxable sources, i.e., Victor's mother and father and Gladys. However, petitioners had no documentary or other evidence to support their self-serving testimony, and their *60 testimony on the witness stand, particularly when compared with statements made to the revenue agents during their investigation, is so conflicting and inconsistent as to be in the large part unbelievable. Victor first told the agents that most of the unexplained deposits prior to his marriage to Gladys had come from his mother who in turn had received the funds from her mother. However, when he realized that his mother had died in 1957 (instead of 1958 as he first told the agents) and that his grandmother had died in 1954 (several years before the first year we have before us) and that the evidence indicated that neither of them could have had cash to turn over to Victor, he changed his story to rely more on Gladys as the source of the funds, even during 1957 and 1958 prior to their marriage in February of 1959. The records indicate that Victor's grandmother had gradually disposed of all of her income-producing real estate prior to 1939, had sold her home in 1945, that she lived with her unmarried son, who gave her money to run the apartment, for the last 15 years of her life, and that her estate was valued at less than $9,000 when she died in 1954. Victor's uncle was not called *61 as a witness. It seems quite unlikely from the evidence presented that Victor's grandmother could have given or did give Victor's mother any sizable amounts of cash to turn over to Victor. Admittedly the sole sources of income to Victor's mother were her mother and Victor's father. Victor's father testified and it is apparent from his testimony that what little amounts he was able to turn over to his wife were used for their living expenses. Victor first claimed that he obtained the money to meet his monthly payments to Strickland for the business from his mother who in turn got the money from her mother. However, most of these payments were made after Victor's grandmother had died. It also seems unlikely that Victor's mother would have had any accumulation of cash at home which she could dole out to Victor. Victor's father did not know of any such accumulation, and his mother put the approximately $2,100 she inherited on the death of her mother in a savings account which she did not disturb. On the evidence as a whole we are not convinced that Victor received any of the rather large deposits of currency in his bank account from either his mother, his father, or his grandmother. *62 Gladys' testimony about her cash hoard and what she did with it is also inconsistent with her earlier statements and with the proven facts as to make it unbelievable. Her fabrications stretch the fabric so thin it fails to hold water. In a letter given to the revenue agents in October 1960, Gladys indicated that she had invested in her husband's business after they were married in 1959 about $5,000 which she had taken from her savings accounts and about $10,000 she had taken from cash savings which she kept at home. In a recorded statement given under oath in February of 1962, Gladys stated that she had accumulated and kept in cash at home about $70,000 prior to her marriage to Victor, and that she had given about $30,000 of this cash to Victor at the time of or after their marriage, and still had $40,000 left, the whereabouts of which she would not reveal. She did indicate she first advanced some money to Victor before their marriage in the latter part of 1958. In her testimony at the trial, when confronted with respondent's computations which indicated that Gladys' entire gross take-home pay from her salary from 1940 up to the date of her marriage in 1959 was less than $70,000, *63 Gladys hedged and said that she had been referring to gross income rather than savings when she mentioned the sum of $70,000 in the recorded statement. She also mentioned for the first time that she had received gifts of about $2,900 per year from her immediate employer for a period of 6 or 7 years before he retired. An effort by respondent to verify this during a recess in the trial proved only that it was highly unlikely that her employer, who was then deceased, would have made gifts of this nature to anyone. Furthermore, in her testimony at the trial Gladys testified that she first "loaned" money to Victor in the latter part of 1957, 1373 having loaned him $1,500 in October or November of 1957, that she loaned Victor an additional $12,000-$13,000 on various occasions throughout 1958, an additional $15,000 during 1959, and about $4,500 in 1960, which exhausted her cash savings. Gladys testified that Victor gave her unsecured, noninterest-bearing notes for the advances made prior to their marriage which she destroyed when she and Victor were married. She had no documentary evidence to support her testimony and no record of the amounts advanced. It would appear that both Victor *64 and Gladys changed their stories about the timing of Gladys' advances to Victor after it became apparent that Victor could not have received the unexplained deposits from any of his relatives during the years 1956-1958. It also seems highly unlikely that Gladys would have advanced a large part of her lifetime savings, which she claimed to have accumulated to carry her through her old age, to a man who was married to someone else at the time with no more security than above stated. Despite the above-mentioned inconsistencies and unrealisms in Gladys' testimony, and others that we will not take the time to mention here, we do believe that Gladys had accumulated some cash at home over a period of years and that she began advancing it to Victor for use in his business. It is impossible on the evidence to determine with any accuracy or certainty the amount thereof or just when she advanced it to Victor. Using our best judgment based on all the evidence presented we have determined that the amount she had which she turned over to Victor was a total of $10,000 and that this was advanced $3,500 in 1958, $4,500 in 1959, and $2,000 in 1960. We recognize that this in itself distorts to some *65 extent the earnings picture of Victor's business but it is the best answer we can find from the evidence presented, and we do not want to tax a second time income on which we believe Gladys has already paid tax. Consequently, in Rule 50 computations, credit should be given for the above amounts as income received from nontaxable sources. Petitioners contend that under the method used by respondent to determine the deficiencies their cash living expenses are being included in taxable income twice. The amounts of these expenses are stipulated for each of the years 1956-1959. Victor claims that he took no cash out of the business for living expenses in 1960. It is true that he made no lump-sum entry into cash sales at the end of 1960, as he had done for prior years, but the fact that all of the cash sales recorded on his books for 1960 can be traced to checks deposited in his business bank account during that year, coupled with the fact that he had cash receipts in that year other than checks, belies Victor's claim that he took no cash out of the business in 1960. Respondent estimated petitioners' cash living expenses for 1960 by taxing an average of the stipulated expenses for the *66 preceding 4 years, which we find is reasonable. In any event, no evidence was offered by petitioners on the point and respondent's determination is presumed to be correct. It is true that if the cash petitioners used for living expenses was first deposited in the bank and then withdrawn and spent, the amount thereof would be included in income twice under respondent's method of computing petitioners' business income. However, Victor's testimony and other evidence indicate that the cash used for living expenses was never deposited in the bank but was taken directly from cash sales. If it was not deposited in the bank it would not be charged to cash sales under respondent's method and would represent untaxed business income unless added to income as living expenses. The amounts which were added to business income by Victor's lump-sum entries to cash sales for the years 1956-1959 were properly included in reported sales and credit was given for them in respondent's computation. We do not agree with petitioners' argument. The burden of proof with respect to fraud is on respondent and he must prove fraud by clear and convincing evidence. Arlette Coat Co. . We *67 have found that respondent carried that burden and that petitioners filed false and fraudulent returns with intent to evade tax for each of the years here involved. The evidence in this case fairly reeks of an intent to evade tax on the part of Victor. While his books and records reflecting charge sales were complete and accurate, Victor kept no permanent records of his cash sales, and it is impossible to determine with any certainty what those cash sales were. Victor admittedly withdrew cash directly from business receipts and made no permanent record of those withdrawals. While he added a lump sum to cash sales at the end of the years 1956-1959, he made no such entry for 1960, and the entries made 1374 for the prior years appear to be estimates. At one time Victor said he took exactly $100 per week out of the business receipts and deposited the rest in the business bank account. Later he said that this was not quite right - that he took what he needed and put IOU's into the cash drawer to reflect the amounts taken. If any records of these withdrawals were kept, they were not available when the respondent started his investigation. There was practically no currency deposited *68 in the bank account and credited to sales, which discredits Victor's testimony that he deposited the excess cash in the bank. Although Victor stated that he took no cash from the business in 1960, the bank records indicate that he deposited no cash which was credited to sales in that year. All of the above convinces us that Victor knew what he was doing in not contemporaneously recording cash sales in permanent records, that he failed to do so in order to avoid paying tax on all of his cash sales, and that when he made out his tax returns and reported gross receipts of the business as reflected on his books, he knew he was not reporting all of his cash sales. Incomplete records so purposely kept are evidence of fraud. (C.A. 5, 1960). Victor filed tax returns for 5 years during which there was a consistent understatement of large amounts of income. This is evidence of fraudulent intent. (C.A. 5, 1966), reversing in part for other reasons a Memorandum Opinion of this Court; (C.A. 3, 1965), affirming per curiam a Memorandum Opinion *69 of this Court, certiorari denied ; (C.A. 3, 1964), affirming per curiam a Memorandum Opinion of this Court. For each of the years involved herein, Victor's income was determined by the respondent to be from about $14,000 to $17,000 greater than the income he reported on his return. Such amounts were significant and must be taken into account in determining fraud. . Moreover, Victor not only failed to include all business receipts on his tax return, but he also did not include certain specific items of income, such as interest from savings accounts and reimbursed expenses for which he had taken deductions; nor did he report gain on the sale of his private residence. Throughout the investigation and trial Victor claimed that he must have simply overlooked such items and conceded that respondent correctly included them in his income. Despite such willingness on the part of petitioner to concur in the determination of these amounts, we find them significant indication in an intent to report as little taxable income as possible. In addition, Victor took substantial *70 deductions with respect to his private residence. Examples are depreciation, repairs, and electricity - expenses which were not merely the result of oversight. Deductions taken carelessly are evidence of fraud. . Finally, we find that Victor was uncooperative with the agents; he gave completely implausible answers to questions with regard to his cost of living. During the 5 years involved, he paid for his partner's share in Glass, two expensive cars, and expenses incurred by a very sick wife; he had made numerous loans; he remarried; he supported two teenage daughters. It is not feasible that all this could have been done on the income reported by Victor or with funds from other sources. Victor's explanations of the other sources were for the most part unbelievable; when faced with inconsistencies in his prior statements and the facts as they developed during the hearing he did not hesitate to vary his story. He also failed to tell respondent's agents, when asked about bank accounts, about the two savings accounts which he and Gladys had opened after their marriage. We have found from the entire record that respondent has proved *71 by clear and convincing evidence that petitioners filed fraudulent returns for each of the years involved herein with the intent to evade tax. Consequently, the assessment and collection of tax for 1956 and 1957 are not barred from the statute of limitations. Decisions will be entered under Rule 50. 1375 Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Victor Mecca and Gladys Mecca, Docket No. 6170-64; and Victor Mecca, individually and as surviving spouse of Helen Mecca, Deceased, Docket No. 6171-64.↩
2. A claim for an increased deficiency for the taxable year 1960 made by respondent during the trial has been abandoned by respondent on brief.↩
3. The only items in dispute are the alleged unreported business receipts of petitioners, because they have conceded that other unreported items of income and disallowed deductions were properly determined by respondent.↩